Barry KEENE, Plaintiff,

v.

William French SMITH, et al.,
Defendants.

No. CIV. S–83–287 RAR.

United States District Court,
E.D. California.

Sept. 7, 1983.

James Scanlon, Sacramento, Cal., for Lawyers Alliance for Nuclear Disarmament.

John G. Donhoff, Sacramento, Cal., Tobin & Tobin, Paul E. Gaspari, Scott R. Keene, San Francisco, Cal., for plaintiff, Barry Keene.

David Anderson, Department of Justice, Washington, D.C., for defendants, William French Smith, et al.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RAMIREZ, District Judge.

On May 23, 1983, the above-entitled matter came on regularly for hearing on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss. Having read and considered the memoranda submitted by counsel, the attachments thereto, the pleadings, and the arguments of respective counsel, the Court herein grants plaintiff's motion for a preliminary injunction and denies defendants' motion to dismiss. The following shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

FINDINGS OF FACT

### I

The present action challenges the constitutionality of the Foreign Agents Registration Act, 22 U.S.C. §§ 611, *et seq.* inasmuch as plaintiff contends that certain portions of the Act violate the First Amendment to the United States Constitution, which provides in relevant part:

> Congress shall make no law . . . abridging the freedom of speech . . . .

### II

Plaintiff is a member of the California State Senate and a member of the California State Bar. He desires to exhibit three films produced by the National Film Board of Canada which bear the titles, *If You Love This Planet, Acid Rain: Requiem or Recovery,* and *Acid From Heaven.* The former addresses the possible state of the earth and society after a nuclear holocaust; the latter two films address the problem of the acidification of atmospheric precipitation by exposure to sulfur dioxide in the air, commonly known as acid rain. Plaintiff alleges he is deterred from exhibiting the films by a statutory characterization of the films as "political propaganda." Plaintiff further alleges that if he were to exhibit the films while they bore such characterization, his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired.

### III

Defendants are, respectively, the Attorney General of the United States and the Chief of the Registration Unit of the Internal Security Section of the Criminal Division of the United States Department of Justice. Responsibility for the administration and enforcement of the Foreign Agents Registration Act is vested in the Attorney General, who has delegated his authority to an appropriate officer. 28 U.S.C. § 510; 28 C.F.R. § 0.61(b), 28 C.F.R. Part 5 (1982).

### IV

Section 2 of the Foreign Agents Registration Act, 22 U.S.C. § 612, requires each "agent of a foreign principal," defined by § 1(c), 22 U.S.C. § 611(c), to register as such with the Attorney General of the United States. The National Film Board of Canada has so registered.

### V

Section 4 of the Act, 22 U.S.C. § 614, requires all registrants to supply the Attorney General with two copies of any "political propaganda" intended for dissemination in the United States. "Political propaganda" is defined, in relevant part, as follows:

> The term "political propaganda" includes any oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign county or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions . . . .

22 U.S.C. § 611(j). Section 4 of the Act further prohibits the dissemination, in the United States, by any registrant, of any "political propaganda" unless the material is "conspicuously marked" at its beginning with a four-component statement. The four components of the required statement are: (1) "the relationship or connection between the person transmitting the political propaganda or causing it to be transmitted and such propaganda," (2) the fact that the supplier of the material is an agent of a foreign principal, (3) the fact that the supplier's registration statement is available for public inspection in Washington, D.C., and (4) that the registration of agents of foreign principals by the United States does not indicate approval by the United States of the material.

## VI

Section 10 of the Act, 22 U.S.C. § 620, authorizes the Attorney General to adopt regulations to implement the Act. Pursuant to that authority, the Attorney General adopted regulations which authorize slightly different treatment of films:

Unless specifically directed to do so by the Assistant Attorney General, a registrant is not required to file two copies of a motion picture containing political propaganda which he disseminates on behalf of his foreign principal, so long as he files monthly reports on its dissemination. In each such case this registrant shall submit to the Registration Unit either a film strip showing the label required by section 4(b) of the Act or an affidavit certifying that the required label has been made a part of the film.

28 C.F.R. § 5.400(c).

## VII

From the materials submitted to the Court, the Court infers that the National Film Board of Canada does not routinely affix the § 4 label to all of the films that it distributes in the United States. Instead, it would appear that the Film Board transmits a list of all of its films to the Registration Unit which then requests copies of the films which the unit believes fall within the statutory definition of "political propagan-

da." Upon receipt of the requested copies, the unit determines whether any of the films are "political propaganda" within the meaning of the Act. If any film is determined to be "political propaganda," the Registration Unit so informs the Film Board which then must affix the § 4 label to the copies of the film and file the Dissemination Reports required by the Act, 22 U.S.C. § 614(a), 28 C.F.R. § 5.401.

## VIII

The procedure described in Paragraph VII was followed by the defendants in evaluating the films *If You Love This Planet*, *Acid Rain: Requiem or Recovery*, and *Acid From Heaven*. On January 13, 1983, defendants notified the National Film Board of Canada that a determination had been made that the films were "political propaganda," and that the Film Board must make the § 4 label "a part of the film[s]," 28 C.F.R. § 5.400(c), and file the appropriate reports, 28 C.F.R. § 5.401.

## IX

In March 1983, defendants agreed to review their administrative decision and to refrain from imposing the labelling and reporting requirements of the Act on the films pending that review.

## X

Defendant Clarkson, Chief of the Registration Unit, has supplied the Court with an uncontradicted affidavit which establishes that the defendants have consistently interpreted the Act and the regulations to apply only to the registrant. According to the authoritative agency interpretation of the Act and the regulations, plaintiff is free to remove the § 4 label before exhibiting the films.

## CONCLUSIONS OF LAW

## I

The present action arises under the United States Constitution, and as such, subject matter jurisdiction is predicated on the provisions of 28 U.S.C. § 1331.

*A. Standing*

## II

■ As a general rule, the doctrine of standing may be employed so as ... "to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct, the litigant advancing it is not properly situated to be entitled to its judicial resolution." 13 Wright, Miller, & Cooper, *Federal Practice & Procedure* § 3531. Standing implicates the Court's subject matter jurisdiction because the Constitution confers judicial power on the courts only for "cases and controversies." U.S. Const. art. III, § 2, cl. 1; *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In order to demonstrate standing, a plaintiff must exhibit (1) that he has suffered or will suffer imminently some injury, (2) that the injury can fairly be traced to the challenged conduct, and (3) that the injury can be remedied by an exercise of the court's power. *Id.*

## III

■ In evaluating plaintiff's standing, the Court is required to accept all material allegations of the complaint as true:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial court and the reviewing courts must accept as true all material allegations of the complaint, and construe the complaint in favor of the complaining party. [cite] At the same time, it is within the trial court's power to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all the materials of record, the complaint must be dismissed.

*Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This does not and will not preclude defendants from filing an answer which denies the allegations and seeking an adjudication of the issue via a motion for summary judgment, *United States v. Students Challenging Regulatory Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), or via trial, *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission,* 659 F.2d 903 (9th Cir. 1981), *aff'd on other grounds sub. nom. Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* —— U.S. ——, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

## IV

■ Because the federal courts are not to be used as "publicly funded forums for the ventilation of public grievances," *Valley Forge Christian College v. Americans United, Inc., supra,* the injury of which plaintiff complains must be an injury "that is peculiar to himself or to a distinct group of which he is a part, rather than one 'shared in substantially equal measure by all or a large class of citizens.' *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

## V

■ Plaintiff desires to exhibit the films *If You Love This Planet, Acid Rain: Requiem or Recovery,* and *Acid From Heaven,* and it is his claim of status as a would-be exhibitor that differentiates him from citizens generally. There can be little doubt that a film exhibitor, especially in a non-commercial context [1], is likely and reasonably to be understood as using the film to communicate the exhibitor's own ideas. Thus a statute which inhibits the exhibitor's ability to exhibit also impinges on the exhibitor's ability to communicate. It is this special impairment on the plaintiff's ability

---

1. The fact that the plaintiff plans to exhibit the films in a non-commercial context can reasonably be inferred from the four corners of the complaint. The plaintiff is not in the movie business, and his stated reason for wanting to exhibit the films is to influence public opinion on the issues addressed. An amendment to the complaint to make this fact explicit would not, therefore, be unwise.

to communicate which constitutes an injury different in kind from that suffered by the public in general.

## VI

 It is well-settled that the injury of which plaintiff complains must be "distinct and palpable" as opposed to speculative or attenuated. *Warth v. Seldin, supra.* Plaintiff's complaint, when read in light of the affidavits subsequently submitted, adequately alleges an injury that is both real and immediate: exhibition of the films which the statute characterizes as "political propaganda" will brand plaintiff, as an exhibitor, as a purveyor of propaganda, which will have an adverse impact on plaintiff's professional and personal reputation.

In the present case, plaintiff does not complain that he might suffer disfavor from his constituents, colleagues, or prospective clients because they disagree with his position on nuclear weaponry or stationary source emissions. Rather, plaintiff complains that his ability to present his ideas for evaluation on their merits is being impaired by the interjection, into the exchange of ideas, of the characterization of those ideas as "political propaganda" by officials of the United States government. The Court finds, therefore, that plaintiff's injury is real and immediate.

## VII

 In order to demonstrate standing, plaintiff must adequately allege not only an actual injury, but also an injury which "fairly can be traced" to defendants' conduct. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Plaintiff has made the requisite showing by alleging that the Act characterizes the films that plaintiff wants to exhibit as "political propaganda," that such a characterization necessarily denigrates the contents of the films and vilifies plaintiff as a purveyor of propaganda, and that as a result of such vilification clients and constituents will peremptorily reject the ideas that plaintiff hopes to communicate.

Defendants argue that plaintiff has not demonstrated that their acts are causing or will cause plaintiff to suffer the injury alleged because there is an independent actor, the public, which intervenes between defendants and the plaintiff's injury. *See Simon v. Eastern Kentucky Welfare Rights Organization, supra.* The Court rejects this argument since the injury of which plaintiff complains is the handicap placed upon him as an entrant into the marketplace of ideas by the statute's opprobrious characterization of plaintiff's chosen medium of expression. If the statute's characterization does indeed handicap plaintiff's ability to communicate his ideas, then it is defendants' enforcement of the statute which is the cause of plaintiff's injury.

## VIII

 A third prerequisite to a demonstration of standing is that plaintiff complain of an injury which is susceptible of judicial remedy. *Simon v. Eastern Kentucky Welfare Rights Organization, supra.* In this case, plaintiff has asked the Court to enjoin defendants from acting pursuant to an allegedly unconstitutional statute which denigrates the three films at issue. Because it is the statute which is alleged to distort the free exchange of ideas, and because defendants are the federal officials charged with the enforcement of the statute, and because the proper defendants are before the Court, *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949), *Philadelphia Co. v. Simpson,* 223 U.S. 605, 620, 32 S.Ct. 340, 344, 56 L.Ed. 570 (1912), an injunction directed to these defendants will provide plaintiff with the desired relief.

Defendants again argue that an injunction may not provide plaintiff with the relief sought, because his constituents, colleagues, and clients may nevertheless react negatively to his exhibition of the films. This argument is likewise rejected by the Court because defendants fail again to distinguish between plaintiff's willingness to risk the disapproval of his constituents and clients based on the merits of his ideas and his unwillingness to risk their disapproval based on his exhibition of films which de-

fendants have officially branded as "political propaganda." Defendants' argument that an injunction will not remedy the injury because plaintiff's constituents and clients may still disapprove of plaintiff's exhibition of these three films, even without the official characterization as "political propaganda," is irrelevant and quite possibly disingenuous.

## IX

While plaintiff has standing to complain that the statute by its terms violates his constitutional rights, he does not have standing to complain of the labelling requirement of § 4 *per se.* The uncontradicted affidavit of defendant Clarkson establishes that plaintiff has no obligation with respect to the label, and that plaintiff is free to remove the label if he chooses.[2] Plaintiff is not, therefore, injured in any way whatsoever by the labelling requirement.

## B. Sufficiency of the Complaint

### X

Plaintiff has stated a cause of action upon which relief can be granted. Indeed, it does not appear that defendants really contend that the complaint suffers from any formal defects. The complaint adequately if imperfectly alleges that defendants are the officers to whom enforcement of the Foreign Agents Registration Act is assigned, that they have acted in such a way as to cause plaintiff injury, purportedly under the authority of the Act,

and that their conduct is malfeasance, because the Act under which they claim authority violates the United States Constitution. These allegations are sufficient to state a claim for relief.

Defendants' motion to dismiss actually urges this Court to adjudicate the merits of plaintiff's claim, i.e., that the complaint fails to state a claim for relief because the statute under which they act is constitutional. A motion to dismiss for failure to state a claim is not an appropriate vehicle to obtain an adjudication of the constitutionality of a statute. Indeed, a motion for judgment on the pleadings once a response has been filed, *Aldabe v. Aldabe,* 616 F.2d 1089 (9th Cir.1980), or in the alternative a motion summary judgment would appear to the Court to be the more appropriate of motions available to the defendants under the given circumstances.

## C. Preliminary Injunction

### XI

An applicant for a preliminary injunction is entitled to relief if he demonstrates either probable success on the merits plus irreparable injury or the existence of serious questions meriting litigation plus a significantly heavier burden of hardships. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197 (9th Cir.1980).

### XII

There can be no question but that the present action raises a substantial question

---

**2.** The Court notes that no reasonable reader of the statute and regulations could have imagined that the recipient of the material was free to remove the label. While the statute clearly places the affirmative obligation to affix the label on the registrant, the statute likewise is intended to assure that the ultimate recipient of the material is informed that it originated with an agent of a foreign power. For instance, the statute requires that the label be in the language of the material itself, not the language of the foreign power or of the first-tier recipient. The regulations are even more plain. Section 5.400(c), 28 C.F.R., relieves the registrant of the obligation to supply two copies of every film to the Registration Unit, provided that the registrant demonstrates or certifies that the required label "has been made a part of the film."

Section 5.402(e) requires the registrant "to insert at the beginning of a [still or motion picture] a statement which is reasonably adapted to convey to the viewers thereof such information as is required . . . ." Since the chief importance of the labelling requirement is obviously to inform viewers of the origins of the film, it is frankly surprising to learn that exhibitors of material covered by the Act may, with impunity, frustrate Congressional intent. However, the Court must defer to a consistently applied agency interpretation of its own regulations, *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625, and the agency interpretation of its regulations and the statute effectively eliminates this aspect of plaintiff's challenge to the Act.

warranting litigation. First, the statute unambiguously implicates freedom of speech, which, in the hierarchy of American values, has pride of place. Second, the statute, by focussing on materials that address issues of public policy, is content-sensitive; content-sensitive statutes have long been held to present the most significant threat to First Amendment rights. *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Third, the statute, by focussing on materials that address public policy issues, applies to those materials whose protection is the central concern of the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976); *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968) ("Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms.").

### XIII

Defendants' argument that plaintiff's action lacks merit because the Foreign Agents Registration Act has previously been found to be constitutional is unpersuasive. The subparts of the Act that have been adjudicated constitutional are not the subparts that are challenged by this action. *See, Attorney General v. The Irish People, Inc.,* 684 F.2d 928 (D.C.Cir.1982) (duty of agents of foreign principals to register); *United States v. Peace Information Center,* 97 F.Supp. 255 (D.C.D.C.1951) (same); *Attorney General v. Irish Northern Aid Committee,* 346 F.Supp. 1384 (S.D.N.Y.), aff'd, 465 F.2d 1405 (2nd Cir.1972) (duty of agents of foreign principals to make books and records available for inspection). No court has ever held that Congress acted constitutionally when it chose to characterize all materials originating from a foreign source and addressing public policy issues as propaganda. *Cf., Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

**3.** This Court entertains no doubts that an identification of the source is reasonably likely to assist the reader or viewer in evaluating the

### XIV

Defendants' contention that the challenged provisions of the Act are constitutional because they advance a compelling public interest is likewise unpersuasive. Defendants identify as compelling Congress' interest in assuring that citizens are given some means of sensibly assessing the credibility of certain materials by requiring the identification of their source. Even assuming *arguendo* that this interest is compelling,[3] a proposition about which this Court entertains some doubts, *see, Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the Court rejects the argument that branding *all* materials of foreign origin as "political propaganda" advances that interest. Congress could easily have imposed an identification requirement without denigrating the affected materials.

### XV

Defendants' contention that the phrase "political propaganda" does not, in fact, denigrate the materials to which it is applied must also be rejected. Defendants suggest that the ordinary individual understands that the phrase "political propaganda" is used as often with neutral connotation as it is with a negative connotation. To the extent that this argument is sincere, it is fatuous. "Political propaganda" is ordinarily and commonly understood to mean material that contains half-truths, distortions, and omissions. To characterize a particular expression of political ideas as "propaganda" is to denigrate those ideas.

### XVI

Defendants strongly urge the Court to accord great deference to Congress' ability to create a term of art, in this case "propaganda" in a non-pejorative sense. With this proposition, in the abstract, the Court has no dispute. Indeed, in *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 315, 62 L.Ed.2d 199 (1979), the United States Supreme Court noted:

weight to be given to a particular piece of advocacy. Indeed, this would seem to be one of the major, unspoken premises of the law.

A fundamental canon of statutory construction is that, *unless otherwise defined,* words will be interpreted as taking their ordinary, contemporary, common meaning. *Burns v. Alcala,* 420 U.S. 575, 580–581, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975). (emphasis supplied) There are, however, several reasons why this Court cannot simply defer to the particular Congressional definition which defendants seek to have this Court apply.

## XVII

■ It is well-established that courts must not defer to Congress when adjudicating the constitutionality of statutes which implicate rights guaranteed by the First Amendment. On the contrary, courts are obliged to subject these statutes to "exacting scrutiny." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 (1978); *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938).

## XVIII

In the instant case, exacting scrutiny leads to the tentative conclusion that Congress did, in fact, intend to denigrate the affected materials by the use of the term "political propaganda". In particular, the legislative history of the Foreign Agents Registration Act prompts the conclusion that Congress used the phrase "political propaganda" in a derogatory sense. The Act was enacted in 1938, "as a result of recommendations of the special committee that was appointed by the Seventy-third Congress to investigate un-American activities." H.R.Rep. No. 1381, 75th Cong., 1st Sess. 1 (1937). Congress knowingly used the word "propaganda" as a term of opprobrium:

Incontrovertible evidence has been submitted to prove that there are many persons in the United States representing foreign governments ,or foreign political groups, who are supplied by such foreign agencies with funds and other materials to foster un-American activities, and to influence the external and internal policies of this country, thereby violating both the letter and spirit of international law, as well as the democratic basis of our own American institutions of government.

Evidence before the Special Committee on Un-American Activities, disclosed that many of the payments for this propaganda service were made in cash by the consul of a foreign nation, clearly giving an unmistakable inference that the work done was of such a nature as not to withstand careful scrutiny.

As a result of such evidence, this bill was introduced, the purpose of which is to require all persons who are in the United States for political propaganda purposes—propaganda aimed toward establishing in the United States a foreign system of government, or group action of a nature foreign to our institutions of government, or for any other purpose of a political propaganda nature—to register . . . .

This required registration will publicize the nature of subversive or other similar activities of such foreign propagandists so that the American people may know those who are engaged in this country by foreign agencies to spread doctrines alien to our democratic form of government, or propaganda for the purpose of influencing American public opinion on a political question.

. . . .

We believe the spotlight of pitiless publicity will serve as a deterrent to the spread of pernicious propaganda. We feel that our people are entitled to know the sources of any such efforts, and the person or persons or agencies carrying on such work in the United States.

*Id. See generally,* H.R.Rep. No. 200, 74th Cong., 1st Sess. (1935), H.R.Rep. No. 1057, 74th Cong., 1st Sess. (1935).

The particular portions of the Act challenged herein were added in 1942, to effectuate the purposes of the Act more directly. *See, Amending Act Requiring Registration of Foreign Agents: Hearings on H.R. 6045*

*Before Subcomm. No. 4 of the House Comm. on the Judiciary,* 77th Cong., 1st Sess. 17 (Statement of L.M.C. Smith, Chief, Special Defense Unit, Department of Justice) (1941). Congress was still concerned about the problem of "colored and twisted," *id.* at 13, presentations of ideas. H.R.Rep. 1547, 77th Cong., 1st Sess. (1941). Congress defined "political propaganda" broadly, not because it was casting about for a neutral term to describe materials appropriately labelled, but because it was determined to prevent any pernicious publications from escaping the statutory net. *Hearings, supra* at 18. In defining "political propaganda" Congress was trying to describe, clearly and comprehensively, that which it perceived to constitute a threat to the polity, and it used terms which it understood to convey that perception. Congress was acting artlessly when it defined the term "political propaganda."

### XIX

Finally, this Court is somewhat troubled by the scope of the deference to Congressional choice urged by the defendants. While it is true that Congress deserves wide latitude for identifying the proper objects of legislation and for delimiting the scope of its enactments, this latitude is not so great as to amount to a license to use language without regard to its commonly accepted and understood meaning. In short, even Congress must ultimately respect the limits of the English language—a language which is generally considered flexible but not infinitely malleable. Congress may not, for instance, claim Humpty Dumpty's prerogative:

> "When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean,—neither more nor less."

Carroll, Lewis, *Through the Looking Glass* (emphasis in the original). This Court therefore harbors some doubt about the power of Congress to select a term which has a widely understood negative connotation and to designate it as a term of art theoretically having no negative connotation. It may be beyond the power of Congress to determine, for example, that all materials addressing public policy issues and originating from foreign sources shall hereinafter be called "poison" or "obscenity." There are words that cannot be stripped on their nuance. The use of such a word as a term of art is, at least, troubling.

### XX

■ The hardships likely to befall plaintiff from a denial of the preliminary injunction are substantially greater than the hardships to befall defendants from a grant of such relief. The injury of which plaintiff complains is a loss of First Amendment freedoms: every day that the films which plaintiff wishes to exhibit bear the stigma of a characterization as "political propaganda" is a day when the films are unavailable to him as a medium of communication, thus abridging plaintiff's freedom of speech. Beyond peradventure of a doubt, such injury is irreparable. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Moreover, because of the great value placed on First Amendment freedoms, a loss of freedom of speech would necessarily constitute a grievous hardship. By contrast, no injury to defendants, or to the public interest, has been suggested to the Court. The purpose of the labelling requirement of the Foreign Agents Registration Act is to inform the ultimate viewers of the fact that the films were produced by the National Film Board of Canada. The Court has no reason to suppose that the films which plaintiff wants to exhibit would otherwise lack the identifying information. *See generally,* 17 U.S.C. § 401.

### XXI

Having concluded that plaintiff has adequately demonstrated his entitlement to a preliminary injunction under one of the two applicable standards, the Court intimates no view on plaintiff's entitlement to a preliminary injunction under the remaining standard.

### XXII

Although plaintiff has no standing to complain of the labelling requirement *per*

*se,* the Court concludes that it is impossible to give plaintiff any effective relief *pendente lite* without exempting the films which plaintiff wants to exhibit from the requirements of the Act. The labelling requirement only has application to those materials termed in the statute "political propaganda." It is the term "political propaganda," however, about which plaintiff complains, and this Court has determined that there is sufficient basis in law and fact to enjoin the defendants from so characterizing the films. Without such a characterization there is no basis for imposing the labelling requirement. The definition of "political propaganda" is an inextricable element of § 4 of the Act, and so long as defendants are enjoined from employing that definition, they must be enjoined from requiring labelling and reports in accordance with § 4.

### XXIII

To the extent that any of the foregoing Findings of Fact are deemed to be Conclusions of Law or to the extent that any of the foregoing Conclusions of Law are deemed to be Findings of Fact, the same shall be deemed Conclusions of Law or Findings of Fact as the case may be.

### ORDER

For the reasons as set forth herein, IT IS HEREBY ORDERED that defendants, their representatives, agents, servants, employees, attorneys and all persons, agencies, and entities who act in concert with them are forthwith enjoined from imposing any of the requirements of the Foreign Agents Registration Act on the films *If You Love This Planet, Acid From Heaven,* and *Acid Rain: Requiem or Recovery* pending the disposition of this action.

IT IS FURTHER ORDERED that pursuant to the provisions of Rule 65(c), F.R. Civ.P., plaintiff shall post security with the Clerk of the Court in the sum of $1,000.00, said sum to secure payment of any and all costs and damages as may be incurred by defendants if ultimately found to be wrongfully enjoined and/or restrained.