Mitchell BLOCK, et al., Plaintiffs,

v.

William French SMITH, et al., Defendants.

Civ. A. No. 83–0672.

United States District Court, District of Columbia.

April 2, 1984.

Susan W. Shaffer, Charles S. Sims and Burt Neuborne of the American Civil Liberties Foundation, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of N.Y., Daniel Berger, Marcia Cleveland, Lawrence S. Kahn and James Periconi, Asst. Attys. Gen., New York City, for plaintiff State of N.Y.

J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., at the time briefs were filed, Surell Brady, David J. Anderson, Harriet Kerwin and Frederick Close, Attys., Dept. of Justice, Washington, D.C., for defendants.

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

Plaintiffs in this case are distributors and potential exhibitors of three films pro-

duced by the National Film Board of Canada (NFBC). They challenge the United States Department of Justice's application of certain provisions of the Foreign Agents Registration Act (FARA), 22 U.S.C. §§ 611–618 (1983), to these films. To fully understand the nature of this case, it seems necessary to set out the statutory framework of the FARA. A foreign agent who produces or sends a film or films to this country sends a copy thereof to the Department of Justice. The Department then determines whether each film falls within the definition of the term "political propaganda" as defined in the FARA statute and its regulations. The FARA requires that every person acting as an agent[1] of a foreign principal[2] file a registration statement with the United States Attorney General which provides the agent's name, address and information about the relationship to and activities on behalf of the foreign principal. 22 U.S.C. § 612(a). "Political propaganda" is defined in relevant part as:

... any oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person

disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions...

22 U.S.C. § 611(j).

If it is determined that an agent is transmitting any "political propaganda" "for or in the interests" of the foreign principal, the agent is required under the FARA to file a statement with the Attorney General within 48 hours of the transmittal of the material setting forth full information as to the places, times and extent of such transmittal. 22 U.S.C. § 614(a). The Act also requires that the agent affix a label to any material that has been deemed "political propaganda." 22 U.S.C. § 614(b). The label is to reveal "that the person transmitting the political propaganda ... or causing it to be transmitted is registered ... as an agent of a foreign principal" among other

**1.** The term "agent of a foreign principal" is defined in the FARA as:

(1) any person who acts as an agent, representative, employee, servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person—

(i) engages within the United States in political activities for or in the interests of such foreign principal;

(ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal;

(iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or

(iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and

(2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.

22 U.S.C. § 611(c).

**2.** Under 22 U.S.C. § 611(c), the term "foreign principal" includes:

(1) a government of a foreign country and a foreign political party;

(2) a person outside of the United States unless it is established that such person is an individual and a citizen of and domiciled within the United States, or that such person is not an individual and is organized under or created by the laws of the United States or of any State or other place subject to the jurisdiction of the United States and has its principal place of business within the United States; and

(3) a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country.

things. The labelling requirement of the FARA is not at issue in this case since the parties, by agreement, determined that the requirement did not apply to the plaintiffs herein. *See Defendants' Memorandum* at p. 2; *Clarkson Declaration* at ¶ 4; *Plaintiff's Memorandum* at p. 1. In addition, the statute and the regulations *do not* require the Department's label of political propaganda to appear on the film at the time of its showing to the public in any theater or other exhibition method where the public might see the film either publicly or privately. *Defendants' Statement of Material Facts* at ¶ 9.

By regulation, the Justice Department requires the filing of Form OBD–69 which calls for the agent to disclose "names and addresses of persons or organizations receiving 100 copies or more" of the materials and specifically for films, the names of any "station, organization, or theater" using the film irrespective of the number of copies received. 28 C.F.R. § 5.401 (1983); *See Declaration of Charlie Sims* at Exhibit A.

This case centers around three films that were produced by the NFBC. The NFBC office in New York City has since 1947 registered with the Attorney General's Office as an agent of the NFBC, which they have conceded is a part of the Canadian government. *See Defendants' Reply Memorandum* at Exhibit A, ¶¶ 6, 9. Its most recent supplemental registration statement describes its activities on behalf of the government of Canada as the:

> Promotion and distribution through commercial and non-commercial channels of Canadian Government information, documentary, and cultural films, filmstrips, and other visual aid materials to public film libraries, educational institutions, government agencies, etc. Activities also include dissemination of catalogues, folders and information sheets describing the films distributed; participation at conferences, seminars and other func-

tions pertaining to the use of audiovisual materials.

*Clarkson Declaration* at Exhibit B.

In accordance with the requirements of the FARA, the NFBC periodically submits information to the Justice Department on its activities, including the titles of films it transmits within the United States. *See e.g., Clarkson Declaration* at Exhibit B. In the fall of 1982, the Department decided to review five films from a list of 62 films and videotapes distributed by the NFBC during January to June of 1982. *See Jensen Statement* at p. 6. On January 13, 1983, the Registration Unit of the Justice Department informed the NFBC that three of the five films constituted "political propaganda" within the meaning of 22 U.S.C. § 611(j). *Clarkson Declaration* at Exhibit A. The three films were entitled *If You Love This Planet*, a film depicting the perils of nuclear war, and *Acid from Heaven* and *Acid Rain: Requiem or Recovery*, two films concerning the alleged detrimental effects of acid rain on the environment.

Because the Department had found the films to fall within the "political propaganda" definition of § 611(j), the NFBC was informed that it would be required to affix a label identifying the foreign source of the films, and in addition, be required to file the statement concerning the dissemination of the materials pursuant to § 614 of the FARA. Pursuant to 28 C.F.R. § 5.2, the plaintiffs in this case, who are not affiliated with the NFBC, wrote the Department of Justice in an attempt to clarify their obligations under the FARA. When the Department did not respond, this action ensued.[3]

Plaintiffs seek to prohibit the United States Department of Justice from enforcing the provisions of the FARA with respect to the three NFBC films. Specifically, the plaintiffs claim that by labelling the films as "political propaganda", the Depart-

---

**3.** At this time, the Department is "awaiting a court order regarding the application of the term 'political propaganda' to the three films" before requiring the label to be affixed to the films. Additionally, there have been no dissemination reports filed by the NFBC concerning these films. *Clarkson Declaration* at ¶ 3.

ment has injured their First Amendment rights. Plaintiffs claim that this action will deter members of their potential audiences from seeing the films and that the action "damages the processes of self-government" by denigrating the films' messages. *Plaintiffs' Memorandum* at p. 8. Additionally, they claim that the reporting of their names to the Department of Justice as exhibitors of the films will cause injury to their reputation since they will be stigmatized as exhibitors of "un-American" or "unpatriotic" materials. *See Plaintiffs' Memorandum* at p. 9, n. *. Given these allegations, plaintiffs claim they have or will suffer sufficient injury in fact which enables them to assert the claim that the FARA is unconstitutional on its face or as applied.

The Court has before it cross-motions for summary judgment and defendants Motion to dismiss on the ground that plaintiffs lack standing to maintain this action. Upon consideration of the parties' memoranda and the entire record herein, the Court is compelled under these facts and under the law to conclude that plaintiffs have failed to allege sufficient facts to meet the requirement of standing and thus grants defendants' Motion to Dismiss.

## II. PLAINTIFFS LACK STANDING TO MAINTAIN THIS ACTION

■ "Standing is an absolute condition which the plaintiff must meet in order to maintain an action." *Winpisinger v. Watson*, 628 F.2d 133, 137 (D.C.Cir.1980). The doctrine is employed "to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct, the litigant advancing it is not properly situated to be entitled to its judicial determination." *Id.* at 137. Defendants claim that the plaintiffs in this case have failed to allege "any facts" in support of their claim of injury. *Defendants' Memorandum* at pp. 3, 10. Because the plaintiffs have not alleged "injury in fact" and since such injury, if any, is not fairly traceable to the defendants' conduct, the court

finds that plaintiffs have no standing to maintain this lawsuit.

■ In order to have standing, the plaintiffs must demonstrate that they have suffered or will suffer some injury-in-fact from the defendants' actions. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). It must be an injury "that is peculiar to himself or to a distinct group of which he is a part, rather than one 'shared in substantially equal measure by all or a large class of citizens.'" *Id.* at 100, 99 S.Ct. at 1608, *citing Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The injury-in-fact requirement insures that a case or controversy exists under Article III, § 2, cl. 1 of the United States Constitution. *Valley Forge College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978).

■ To satisfy the Article III requirements, the plaintiffs must show that they personally have suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants. *Gladstone*, 441 U.S. at 99, 99 S.Ct. at 1607; *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205. Such injury must be "distinct and palpable" as opposed to speculative or attenuated, *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, and the "party seeking review must allege *facts* showing that he is himself adversely affected ...." *Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (emphasis added).

■ At an "irreducible minimum," Article III also requires that the injury can be fairly traced to the challenged actions of the defendants and that the injury is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976); *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758; *Common Cause v. Depart-*

*ment of Energy,* 702 F.2d 245, 250 (D.C. Cir.1983); *Winpisinger v. Watson,* 628 F.2d 133, 139 (D.C.Cir.1980). Even if these criteria are met, a plaintiff may still lack standing "under the prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated . . . ." *Gladstone,* 441 U.S. at 99–100, 99 S.Ct. at 1607–1608.

Upon close examination of the complaint, affidavits and declarations submitted to the Court by plaintiffs, and after construing these documents in favor of the plaintiffs, as dictated by *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) the Court concludes that plaintiffs have failed to meet their burden under Article III.

### A. Plaintiffs Have Failed To Allege Injury-In-Fact

At the outset, it is important to note two things concerning plaintiffs' allegations of injury in this case. First, plaintiffs have not alleged that their rights to obtain, exhibit or view the three films have been interfered with because of the Department of Justice action. Indeed, it is undisputed that they could not allege such injury because the FARA does not prohibit foreign advocacy or place any limitations on the availability or showing of any material deemed to be "political propaganda". *Cf. Jensen Statement* at 7. Additionally, the Court notes that the registration, dissemination, and labelling requirements of the FARA do not apply to any of the plaintiffs in this case. *See Clarkson Declaration* at ¶ 4; Stipulation of June 13, 1983 (agreed that plaintiffs in this case are not "agents of a foreign principal" under the FARA). Plaintiffs, therefore, cannot allege that they are injured because of any requirement in the FARA for action on their part.[4]

Plaintiffs do argue that defendants have caused injury by designating the three films as "political propaganda". More specifically, they claim that "defendants have deterred members of each plaintiff's audience for the films who would have viewed them but for the . . . classification" and that by officially "denigrating" the films' messages, damaged the "processes of self-government by inducing the public to discount both the content of the films and the groups exhibiting them." *Plaintiffs' Memorandum* at p. 8.

The complaint, by itself, does not allege any specific facts tending to show injury to the plaintiffs. For those claims still existing in this case,[5] the complaint notes that the defendants "have caused and are continuing to cause plaintiff irreparable injury by (1) inaccurately stigmatizing him as a disseminator of foreign political propaganda; [and] (2) improperly denigrating the aesthetic, artistic and educational value of the films as political propaganda." *See Complaint* at ¶¶ 17–21. Since the complaint was filed, plaintiffs have submitted a series of declarations in support of their Motion for Summary Judgment, and in order to more specifically allege their particular injuries. The Court concludes, however, that these additional materials amount to no more than speculative personal opinions on the effect of the Justice Department's classification of the films as "political propaganda" and of the requirement that the NFBC provide a list of those organizations that receive copies of the films. As such, the Court is unable to find allegations of a "distinct and palpable" injury.

#### 1. The Dissemination Report

■ Under § 4 of the FARA, agents of a foreign principal who transmit materials determined to be "political propaganda" under the Act are required to file a state-

---

**4.** In contrast, in the case of *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), plaintiffs were denied access to the mails unless they performed the affirmative act of returning a postcard saying that they would accept political propaganda.

Such suppression of communication does not exist in this case.

**5.** Some time after the plaintiffs filed the complaint, the parties reached an agreement with respect to several issues initially raised.

ment with the Attorney General "setting forth full information as to the places, times, and extent of such transmittal." 22 U.S.C. § 614(a). For films, this includes places of exhibition. 28 C.F.R. § 5.401 (1983).

Although no dissemination reports have been filed yet by the NFBC, plaintiffs claim that the potential injury is concrete enough to justify a finding of standing. The Court disagrees. The vast majority of "factual" allegations on this issue that plaintiffs place before the Court in opposition to Defendants' Motion to Dismiss are statements that plaintiffs "do not wish" or "object" to their names being reported to the Justice Department as exhibitors or distributors of "political propaganda". *Cleveland Declaration* at ¶ 8 (New York Attorney General's office asked the NFBC for an assurance that its name would not be reported); *Kulick Declaration* at ¶ 8; *Sauer Declaration* at ¶ 8; *Brown Declaration* at ¶ 7 ("EDF objects to its name being provided to the Department of Justice"); *Cohen Declaration* at ¶ 4 (ETF does not wish its name ... to be reported to the federal government ..."; *Poryles Declaration* at ¶ 2 (Biograph "objects" to revealing its name.); *Shields Declaration* at ¶ 4 (New York Library Association does not want its name reported to the Department of Justice). *Plaintiffs' desires, no matter how genuine, cannot be transformed into facts showing injury due to the reporting of their names.*[6]

In *Field v. Brown*, 610 F.2d 981, 989–90 (D.C.Cir.1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 792 (1980), this Circuit noted:

plaintiffs are not entitled to invoke the judicial power to determine the constitutionality of a statute unless they can demonstrate that they have sustained, or

are in immediate danger of sustaining, a direct injury as the result of enforcement of the statute. *See, e.g. Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct. 2318 [2325], 33 L.Ed.2d 154 (1972), *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). Stated differently, a plaintiff must present "a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. at 14, 92 S.Ct. at 2326.

The only additional allegations the Court can find in plaintiffs' pleadings are generalized allegations that each plaintiff will somehow be "stigmatized" in a negative fashion as an exhibitor or distributor of "political propaganda." *Block Declaration* at ¶ 15 ("We are stigmatized as distributors of foreign political propaganda ... a term which has negative connotations to the American public .... A number of callers have expressed the views ... that we are communists ..."); *Shields Declaration* at ¶ 4 (New York Library Association); *Brown Declaration* at ¶ 7 (Environmental Defense fund "will be known as a disseminator of ... political propaganda, ... [a] characterization which undermines our credibility as a scientifically responsible, politically independent organization .... [S]tigmatization is likely to damage EDF's reputation, and impair [its] ability to raise funds."); *Cohen Declaration* at ¶¶ 6–7 (Environmental Task Force "does not want to be characterized as a disseminator of political propaganda because of the ... adverse impact it would likely have on our role as communicators of credible data .... Such a designation has the connotation to many Americans of 'un-American or communist' activity ...."); *Poryles Declaration* at ¶¶ 4–6 (Biograph Theater is concerned that disclosure of its name will label it an exhibitor of political propaganda. Such a disclosure denigrates its reputation

---

6. Plaintiff Block, the exclusive distributor of the film *If You Love This Planet*, points to the fact that "[a]t least a dozen customers have specifically asked us not to reveal their names ...." *Block Declaration* at ¶ 13. The Court, lacking a more definite statement from Block, assumes that such facts are presented to show that Block is injured by some requirement that he reveal

names to the Justice Department. It is undisputed that Plaintiff Block is not an "agent of a foreign principal" under the FARA and is therefore under no federally imposed obligation to do so. Block's obligation stems from a separate contractual agreement he entered into with the NFBC, and not any Justice Department requirements. *Block Declaration* at ¶¶ 12, 13.

as a theater showing only films of "aesthetic, artistic or educational merit".)

These allegations are highly speculative. In order to find allegations of factually specific injury, the Court would be forced to make several assumptions concerning the reaction of the public to the listing of plaintiffs in the dissemination reports. First, the Court would have to assume that the public would react negatively to a film labelled "political propaganda" despite the neutral definition of the term provided in the FARA. *See* 22 U.S.C. § 611(j). Additionally, the Court would have to assume that this "negative reaction" would cause potential audience members to discount the films' messages or avoid the films completely.[7] Finally, the court would have to assume that the public will lose respect for the plaintiffs because they chose to show the movies, even though it is clear that the FARA does not, on its face denigrate the "aesthetic, artistic or educational merits" of the films.[8] The Court cannot make such assumptions for the plaintiffs in the absence of any facts tending to show that such fears are concrete or likely to materialize as actual injury. *See Winpisinger v. Watson*, 628 F.2d 133 (D.C.Cir.1980). Plaintiffs have failed to allege any facts showing any damage to their respective reputations. Although Plaintiff Block claims that several callers have expressed the view that his company is "communist," nothing the government has said or done can reasonably be interpreted to lead to that conclusion. In addition the Court can-

not find any evidence in the record of any potential viewer or customer of the plaintiffs who has refused or will refuse to deal with the plaintiffs because of their acceptance or potential acceptance of the films.

The injury is not only speculative, but in all likelihood, non-existent. This case is unlike the case of *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) where individuals were required to fill out a card requesting that information determined to be "*communist* political propaganda" be sent to them. The term "communist" is a word that is commonly deemed to be characteristic of un-American or anti-democratic conduct. "Political propaganda" is a term that can refer to both American and foreign advocacy of a particular viewpoint. One who exhibits materials that have not been clearly pejoratively labelled is not injured by the compilation of a list of such exhibitors by the federal government.[9]

### 2. The "Political Propaganda" Classification

Plaintiffs have alleged that the Department of Justice's classification of the films as "political propaganda" under 22 U.S.C. § 611(j) has deterred members of plaintiffs' audiences from viewing the films and has "denigrated" the film's message thereby restricting the free flow of information protected by the First Amendment. *Plaintiffs' Memorandum* at p. 8. The term "political propaganda" is defined in

---

7. The Court believes that it may be just as likely that the added publicity about the films because of this controversy may attract a larger audience for plaintiffs. The result is simply too speculative to predict.

8. The Court notes at this point that one of the films at issue here today, *If You Love This Planet* was awarded an Academy Award by the Academy of Motion Picture Arts and Sciences for Best Short Documentary of 1982.

9. The varied definitions of the term "political propaganda" supplied by plaintiffs and defendants in this case are even more evidence of the speculative nature of plaintiffs' injury. *Compare Newman Declaration* at ¶ 3 and *Dobb Declaration* at ¶ 3 *with* American College and Random House Dictionary definitions provided at

page 14 of defendants' memorandum. The term clearly means different things to different people, but the FARA does not define the term in any negative fashion. As such, the classification of the films as "political propaganda" under the Act and the NFBC's reporting of exhibitors' names to the Justice Department cannot constitute injury. Furthermore, even if the plaintiffs could have alleged more particularized injury, above and beyond their predictions of public reactions, such injury would be due to the public's false impression that the government had negatively classified the films rather than due to the government's attaching of a neutrally defined word under the FARA. As such, plaintiffs' injuries would not be fairly traceable to the defendants' conduct in this case.

the FARA, and it is a fundamental cannon of statutory construction that *"unless otherwise defined,* words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). In this case, the term *is* otherwise defined and the court must therefore defer to the neutral, non-pejorative definition contained in the FARA.

▪ The Court wishes to recognize, however, a point raised by Judge Ramirez in the Eastern District of California. In *Keene v. Smith,* 569 F.Supp. 1513 (1983), Judge Ramirez noted that "it may be beyond the power of Congress to determine, for example, that all materials addressing public policy issues and originating from foreign sources shall hereinafter be called 'poison' ..." *Id.* at p. 1522. Recognizing that such labelling may be inappropriate given the *clear* negative connotations to the word "poison", and given the Court's obligation to subject statutes implicating First Amendment rights with "exacting scrutiny", *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), the Court will briefly examine the purpose of the FARA in order to determine whether the act was designed to impose negative connotations on the materials so as to deter audience viewing. With such a finding, the allegations of government action in this case could be enough to find standing.[10]

In *Attorney General v. Irish People, Inc.,* 684 F.2d 928 (D.C.Cir.1982), the D.C. Circuit extensively reviewed the caselaw and legislative history of the FARA. The Court quoted the Supreme Court decision in *Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943):

> As the House and Senate Committees considering the bill said, it "does not in any way impair the right of freedom of speech, or of a free press, or other constitutional rights." Resting on the fun-

damental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment.

Subsequent to extensive amendments to the Act, one Court still noted that:

> The purpose of the act is to protect the interests of the United States by requiring complete public disclosure by persons acting for or in the interest of foreign principals .... These disclosures offer the Government and our people the opportunity to be informed and therefore enable them to understand the purposes for which they act.

*Attorney General v. INAC,* 346 F.Supp. 1384, 1390 (S.D.N.Y.), *aff'd mem.,* 465 F.2d 1405 (2d Cir.), *cert. denied,* 409 U.S. 1080, 93 S.Ct. 679, 34 L.Ed.2d 669 (1972).

The very existence of the label "political propaganda" neither causes injury to plaintiffs nor inhibits the exercise of the public's right to know. It is clear that Congress sought to bring out in the open those activities by a foreign agent "carried on in particularly sensitive areas in which the line between political and non-political action is difficult to define." H.R.Rep. No. 1470, 89th Cong., 2d Sess. 4 (1966), *reprinted in,* U.S.Code Cong. & Admin.News 1966, p. 2400. Specifically, Congress sought to inform the public of the nature of foreign materials on "matters which on the domestic level would be called a policy matter ...". *Id.* at 7, U.S.Code Cong. & Admin. News 1966, at p. 2403. Acid rain and nuclear war, the issues addressed in the three films in this case are just such issues in which the Government seeks full disclosure of information. The Court notes that the

---

**10.** The Court, however, does not agree with Judge Ramirez' findings on the issue of standing. The Congressman in that case, who wished to exhibit the films, alleged similar injuries as

the plaintiffs herein. The speculative nature of such injuries should have precluded a finding of standing.

classification of the films as "political propaganda", or a similar classification may be the only way to ensure full disclosure since the labelling requirements of 22 U.S.C. § 614 do not apply to exhibitors once they receive the films from the NFBC. Since the classification by itself does not show injury in fact, the Court now proceeds to examine the additional information and pleadings provided to the Court in Opposition to Defendants' Motion to Dismiss.

■ As with the issue of the dissemination reports, the Court finds that plaintiffs have failed to allege specific facts constituting injury that are not speculative in nature. Most of the allegations concerning this issue are speculative opinions as to the effects of the classification.[11] *Ballantyne Declaration* at ¶ 7 ("classification ... will seriously discourage many citizens from attending any viewing"); *Kulick Declaration* at ¶ 7; *Sauer Declaration* at ¶ 7; *Converse Declaration* at ¶ 7; *Erlandson Declaration* at ¶ 6; *Cleveland Declaration* at ¶ 9; *Shields Declaration* at ¶ 5 (New York Library Association "believes" that classification will prejudice attitudes of potential viewers.); *Brown Declaration* at ¶ 10 (Environmental Defense fund stated that "classification will adversely affect the perception of viewers as to the objectivity and scientific merit of the information presented in the films."); *Cohen Declaration* at ¶ 6 (the classification "may" also deter some citizens from viewing the films

at all); *Poryles Declaration* at ¶ 5 (Biograph Theater objects to the classification "so that its audience can freely judge the worth of each film").

The Court can find no allegations of fact that would indicate that audiences have diminished or that citizens are not seeing the films because of the "political propaganda" classification. In addition, there is no evidence in the record of any citizens who have had their opinion of the movies altered in any respect because of the classification.[12] On the contrary, there is some evidence to indicate that the movies are not being affected by the classification. Plaintiff Block admits that distribution of the film *If You Love This Planet* has been profitable and that he plans to continue distributing the film. *Block Declaration* at ¶ 9. Additionally, even though Timothy Lyons, the President of the University Film & Video Association, claims that the classification "threaten[s] the free and open exchange of ideas", in the midst of the controversy, his Association decided to make the film available to participants at a recent film conference. *Lyons Declaration* at ¶¶ 6–7.

## III. CONCLUSION

The pleadings and record herein demonstrate that the statute, the regulations, and the actions of the Department of Justice thereunder, in connection with this case, do not explicitly or implicitly label the exhibi-

---

11. In fact, there is some evidence that the injury plaintiffs really claim is the generalized right of the public to be informed and educated about acid rain and nuclear war. *Cleveland Declaration* at ¶ 10 ("The people of the State of New York are entitled to receive scientific analysis and commentary concerning a problem of immense importance ..."); *see also Ballantyne Declaration* at ¶¶ 8–9; *Kulick Declaration* at ¶ 10; *Sauer Declaration* at ¶ 10. Such a generalized grievance is clearly not enough to confer standing.

12. The only specific factual allegations are contained within the Declaration of Mitchell Block, who is the President of an organization with the exclusive rights in the United States to distribute the film *If You Love This Planet*. Block claims that he and his employees have had to spend numerous hours answering inquiries about the status of the film, and that "sales agents have

received numerous calls seeking information about obtaining the film." *Block Declaration* at ¶ 10. Such facts may just as easily show an increased interest in the film because of its surrounding controversy. Additionally, Block asserts that six potential customers have deferred decisions on whether to use the film until after the controversy surrounding the films has ended and that in his "opinion", other potential customers will never purchase or use the film. *Block Declaration* at ¶ 11. There is still no evidence of a decrease in sales or of any one customer emphatically refusing to use the film because of the classification. Finally, Block presents some opinion evidence that sales are lower than they should be for an Academy Award winning documentary. *See Roberts Declaration* at ¶ 4. Such an estimate on a matter so intimately related to the quality and subject matter of a film is highly speculative.

tors in question or distributors of the three films in question as disseminating anything other than a "communication" 'relative to ... the political or public interests, policies, or relations of a government of a foreign country ...' ". The speculation in the declarations of this record by the plaintiff that the foregoing means that they are on a list of organizations disseminating communist propaganda do not come close to a showing of injury-in-fact under the law. The label "political propaganda" does not mean "communist propaganda" or that the individuals or organizations receiving the films are un-American or communists. Anyone in the American public who visits a theater to see the films or advertisements about it will not be subjected to any denigrating label or be restricted in any fashion by the federal government from viewing the films.

The Court concludes that because the plaintiffs in this case have failed to allege any injury beyond that which is abstract and speculative, they do not have standing to challenge the actions of the Department of Justice under the FARA. As such, plaintiffs' complaint shall be dismissed for failure to state a case or controversy under the United States Constitution. The Court will enter an order in accordance with the foregoing of even date herewith.