**Barry KEENE, Plaintiff,**

v.

**Edwin MEESE,\* et al., Defendants.**

**No. Civ.S–83–287 RAR.**

United States District Court, E.D. California.

Sept. 12, 1985.

On Motion to Alter Judgment Oct. 29, 1985.

* The Court substitutes Edwin Meese as successor to the original defendant, William French Smith, pursuant to F.R.Civ.P. 25.

John G. Donhoff, Jr., Sausalito, Cal., for plaintiff.

James Scanlon, Yuba City, Cal., Mona S. Butler, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

RAMIREZ, District Judge.

The above-entitled matter came on specially for hearing by way of the parties' cross-motions for summary judgment on August 8, 1984. John G. Donhoff, Esq., appeared as counsel for the plaintiff, BARRY KEENE, and David J. Anderson, Esq., United States Department of Justice, appeared as counsel for the defendants, EDWIN MEESE, et al. Having read and considered the briefs and arguments presented by respective counsel, the Court herein renders its decision on the various motions.

### PROCEDURAL AND FACTUAL BACKGROUND

The present action challenges the constitutionality of the Foreign Agents Registration Act, 22 U.S.C. § 611(j)(1), which employs "political propaganda" as a term of art to describe every sort of communicative or expressive medium intended or reasonably adapted to influence persons within the United States with respect to the foreign or domestic policies of a foreign government, the foreign policies of the United States, or certain divisive domestic policies of the United States. Specifically, the plaintiff asserts that the use of the phrase "political propaganda" to describe the materials subject to the Act so denigrates the materials that they are made unavailable to plaintiff as a medium for the expression of his own views and that the freedom of speech guaranteed to plaintiff by the First Amendment is, therefore, abridged.

The Foreign Agents Registration Act ("FARA" or "the Act"), 22 U.S.C. § 611, *et seq.*, was enacted in 1938 and amended in material respects in 1942 and 1966. Act of June 8, 1938, ch. 327, 52 Stat. 631 (1938); Act of April 29, 1942, ch. 263, 56 Stat. 248 (1942); Pub.L. No. 89–486, 80 Stat. 244 (1966). As originally enacted, the intent of the statute was to shine "the spotlight of pitiless publicity" on agents of foreign governments present in the United States who "foster un-American activities, and ... influence the external and internal policies of this country" and thus to deter "the spread of pernicious propaganda." H.R. Rep. No. 1381, 75th Cong., 1st Sess. 2 (1937). Accordingly, the Act requires every "agent of a foreign principal," as defined, to register as such with the Secretary of State. Act of June 8, 1938, ch. 327, § 2, 52 Stat. 632 (1938). It was soon recognized, however, that the mere registration of agents of foreign principals with an obscure subunit of a federal agency in Washington, D.C., would not suffice to apprise the recipients of materials disseminated by agents of a foreign power of the source of such materials. H.R.Rep. No. 1547, 77th

Cong., 1st Sess. 4 (1941); *Amending Act Requiring Registration of Foreign Agents: Hearings on H.R. 6045 Before Subcomm, No. 4 of the House Comm. on the Judiciary*, 77th Cong., 1st Sess. 17 (1941). The Act was therefore amended to define "political propaganda," to require all registrants to mark "political propaganda" with a source-disclosure statement, and to require all registrants to deposit two copies of any "political propaganda" with the Library of Congress and one copy with the Attorney General. Act of April 29, 1942, ch. 263, §§ 1, 4, 56 Stat. 248 (1942).

The purpose of FARA has always been, at least in part, to give notice to the recipients of materials produced by, at the direction of, or under the aegis of a foreign government of the source of such materials; it has always been, at least in part, a "sunshine" statute. H.R.Rep. No. 1381, 75th Cong., 1st Sess. 2 (1937). The 1942 amendments included an express statement of the purpose of the Act:

> It is hereby declared to be the policy and purpose of this Act to protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in light of their associations and activities.

Act of April 29, 1942, ch. 263, § 1, 56 Stat. 248–49 (1942). The 1966 amendments were intended "to strengthen the basic purposes of the original act," H.R.Rep. No. 1470, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 2397, 2398, but in rewriting the statute Congress deemed it appropriate to modify the xenophobic tenor of the original Act and to emphasize the "sunshine" aspect of the law. S.Rep. No. 143, 89th Cong., 1st Sess. 5 (1965). Nevertheless, Congress chose to retain the phrase "political propaganda" to describe the materials subject to the labelling requirement of the Act.

Under the Act, "political propaganda" is defined as

> [A]ny oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party. or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions....

22 U.S.C. § 611(j). Section 4 of the Act, 22 U.S.C. § 614, prohibits the dissemination, in the United States, by any registrant, of any "political propaganda" unless the material is "conspicuously marked" at its beginning with a four-component statement. The four components of the required statement are: (1) "the relationship or connection between the person transmitting the political propaganda or causing it to be transmitted and such propaganda," (2) the fact that the supplier of the material is an agent of a foreign principal, (3) the fact that the supplier's registration statement is available for public inspection at the Department of Justice, and (4) that the registration of agents of foreign principals by the United States does not indicate approval by the United States Government of the material. Thus the information required by the disclosure statement seems wholly innocuous, but the obligation to affix such a statement exists only when an agency of the federal government has determined that the materials are "political propaganda."

The National Film Board of Canada has registered with the Attorney General as an agent of a foreign principal since 1947. In 1983, the Registration Unit of the Internal Security Section of the Criminal Division of

the United States Department of Justice informed the National Film Board of Canada that three of its films—*If You Love This Planet, Acid Rain: Requiem or Recovery,* and *Acid from Heaven*— had been determined to be "political propaganda" within the meaning of the Act and that the Board was therefore obliged to make the disclosure statement "a part of [each] film." *See* 28 C.F.R. § 5.400(c). Shortly thereafter, the Registration Unit agreed to review its determination and to refrain from imposing the labelling requirement pending the review. Six months later this Court issued a preliminary injunction addressed to the defendants forbidding them from enforcing the Act with respect to these three films pending ultimate disposition of the action, finding that the plaintiff had raised substantial issues meriting litigation and that the hardship to befall the plaintiff from a denial of a preliminary injunction was significantly greater than the hardship to befall the defendants from a grant of a preliminary injunction. *Keene v. Smith,* 569 F.Supp. 1513 (E.D.Cal.1983).[1]

The defendants are the federal officers charged with the enforcement of the Act. The plaintiff is a citizen of the United States, a member of the State Bar of California, and a member of the California State Senate. Plaintiff has introduced into evidence uncontroverted declarations, *see* 28 U.S.C. § 1741, that he wishes to acquire and exhibit the three Canadian films as part of his participation in the public debate about appropriate governmental policy respecting nuclear weaponry and stationery source emissions and that he is deterred from doing so by the government's characterization of the materials as "political propaganda."[2] Plaintiff has asked this Court to hold that the use of the phrase "political propaganda" to describe materials subject to the Act abridges his freedom of speech and is, therefore, unconstitutional.

# I

## STANDING

■ At the outset, the Court feels obliged to observe that summary judgment is proper only when a party demonstrates that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. *Franklin v. Murphy,* 745 F.2d 1221, 1235 (9th Cir.1984); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.,* 707 F.2d 1030, 1033 (9th Cir.1983). It is the obligation of the moving party to establish the absence of a genuine issue of material fact. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1250 (9th Cir.1982); *Feldman v. Simkins Industries, Inc.,* 679 F.2d 1299, 1305 (9th Cir.1982). *See Scoggins v. Boeing Co.,* 742 F.2d 1225, 1230 (9th Cir.1984); *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 901 (9th Cir.1983). As such, the party opposing the motion is entitled to have all reasonable inferences drawn in his favor, *Aydin Corp., supra, Retail Clerks Union Local 648, supra,* and need not file counter-affidavits if the moving parties' affidavits are intrinsically insufficient. *Sheet Metal Workers' Int'l Ass'n Local No. 355 v. N.L.R.B.,* 716 F.2d 1249, 1254 (9th Cir.1983) quoting *Hamilton v. Keystone Tankship Corp.,* 539 F.2d 684, 686 (9th Cir.1976) (per curiam). On the other hand, when the moving party does proffer competent evidence tending to prove his version of the facts, the nonmoving party must produce competent evidence tending to prove the contrary; he cannot rest on the allegations or denials of his pleadings. *Franklin v. Murphy, supra; Scoggins v. Boeing Co.,*

---

1. The preliminary injunction did not prohibit the defendants from reconsidering their initial decision that the three films were "political propaganda" within the meaning of the Act. None of the parties to this action, however, has suggested to this Court that such review has mooted the instant litigation.

2. Since the issuance of the preliminary injunction, the plaintiff has obtained and exhibited copies of the three films.

*supra.* These principles of summary judgment jurisprudence apply with equal force to issues going to the court's jurisdiction and to issues affecting the ultimate merits of the litigation. *Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983).

In the present case, the defendants have failed to counter, by affidavit or otherwise, the declarations filed by the plaintiff tending to demonstrate the existence of standing. Instead, defendants have argued that the assertions made by plaintiff are simply insufficient to establish standing and as such defendants are entitled to judgment as a matter of law.

In adjudicating the defendants' motion to dismiss for lack of standing, this Court accepted the relevant allegations of the plaintiff's complaint as true, as it was required to do, *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and concluded that those facts were sufficient to establish standing. *Keene v. Smith, supra,* at 1517–19. The plaintiff has now filed declarations tending to prove each of those allegations, declarations uncontradicted in any particular by the defendants. Accordingly, the Court adheres to its original determination that this plaintiff has standing to challenge the legislation at issue.

■ In order to have standing to litigate a particular dispute, a plaintiff must demonstrate that (1) he has suffered or will suffer imminently some injury, (2) which fairly can be traced to the putatively illegal conduct of the defendants, and (3) which can be remedied by an exercise of the court's power. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). In urging this Court to reconsider its earlier standing adjudication, the defendants have focused exclusively on the first element of the three-part standing test enunciated in *Valley Forge,* the necessity of an injury-in-fact. The defendants rightly argue that an injury sufficient to confer standing must be concrete, not speculative or hypothetical. Defendants vigorously argue that the injury of which the plaintiff complains is entirely speculative and thus insufficient, relying in large measure on *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

In *Laird,* the plaintiffs alleged that the otherwise lawful intelligence-gathering operations of the United States Army chilled their exercise of First Amendment rights because they feared that the defendants might, at some point in the future, make an inappropriate or unlawful use of the data collected. The United States Supreme Court held such allegations inadequate to give the plaintiffs standing. The Court noted that the mere existence of the Army's data-gathering system posed no threat to any cognizable interest of the plaintiffs. Any reduction in First Amendment activities based on the fear of future illegal activity by the government would result from a self-inflicted wound. Similarly, in *United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C.Cir.1984), the United States Court of Appeals for the District of Columbia Circuit pointed out that a governmental policy that does not threaten a sanction does not work a cognizable injury on the complainant, even if the complainant feels deterred from the exercise of his rights by the policy. *Laird* and *United Presbyterian Church* stand for the proposition that a reluctance to engage in First Amendment protected activity prompted solely by a fear of future governmental malfeasance is not sufficient to confer standing. In absence of a bona fide threat of a sanction to be visited upon the plaintiff for the exercise of First Amendment rights, the plaintiff is asserting only "ideological objections" to the governmental policy, which, since the federal courts are not "debating societies," *see Valley Forge, supra,* 454 U.S. at 472, 102 S.Ct. at 758, is not a basis for standing. *Fisher v. Tucson School District No. 1,* 625 F.2d 834, 835 (9th Cir.1980).

■ Neither *Laird* nor *United Presbyterian Church* has any application to the instant case. Plaintiff herein is not, contrary to the contentions of the defendants,

complaining of a "chilling effect" on the exercise of his First Amendment rights; he is complaining of a species of censorship. *See Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968) (a municipal classification scheme that categorizes films as "suitable" or "not suitable" for children on the basis of unconstitutionally vague standards is a form of censorship). A "chilling effect" occurs when an actor is prospectively dissuaded from engaging in First Amendment protected activities by a threat of governmental sanction. Censorship, by contrast, consists of present governmental interference with or suppression of expression. Censorship is a "regulatory, proscriptive, or compulsory" exercise of governmental power, *see Larid, supra,* 408 U.S. at 11, 92 S.Ct. at 2324–25, and it is patently absurd to suggest that one whose expression has been censored by the government lacks standing to complain of that censorship.

The distinction between a "chilling effect" occasioned by a unilateral fear of future governmental misconduct, on the one hand, and censorship, on the other, is well-illustrated by *United Presbyterian Church, supra.* In that case, the plaintiffs challenged on numerous theories Executive Order No. 12333, 3 C.F.R. 200 (1982), alleging three types of injury: a "chilling effect" on prospective First Amendment activities, the threat of being subjected to unlawful surveillance, and present subjection to unlawful surveillance. For reasons discussed above, the Court of Appeals found the first type of injury insufficient to confer standing on the plaintiffs. Similarly, the court found the second type of injury insufficient because the plaintiffs had not and could not allege an invasion of their rights of the imminence and likelihood necessary. *See Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983). With respect to the third type of injury, however, the Court of Appeals affirmed the dismissal of the complaint only because the allegations were not plead with the requisite specificity, *see* F.R.Civ.P. 8(a), and because the relief sought bore no relation to the injury alleged. Clearly, had

the plaintiffs adequately alleged a *present* invasion of their rights and relief commensurate with that injury, they would have had standing to challenge the Executive Order that purportedly authorized the defendants to engage in the acts complained of.

■ In the present action, the plaintiff has shown by competent, uncontroverted evidence, that the defendants have determined that three specific films which plaintiff presently desires to use as media for the expression of his own views are "political propaganda" within the meaning of the Act. The plaintiff is not complaining about a self-inflicted wound; rather, he is complaining about present governmental action in highly specific circumstances of immediate consequence to him. *Cf. Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984). Whether the statute in fact constitutes an abridgment of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.

That the statute is not, by its terms, addressed to the plaintiff personally is immaterial. The United States Supreme Court has specifically said that "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird, supra,* 408 U.S. at 12–13, 92 S.Ct. at 2325. In *Scott v. Rosenberg,* 702 F.2d 1263 (9th Cir.1983), the Ninth Circuit noted

When a governmental demand "imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not· ... deprive the person harmed of standing to vindicate his rights" if he can establish that "the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin,* ... 422 U.S. [490], 505, 95 S.Ct. [2197], 2208 [45 L.Ed.2d 343 (1975) ] ....

*Id.* at 1268. Finally, most instructive is *Lamont v. Postmaster General,* 381 U.S.

301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), wherein the plaintiff challenged a statute which, imposing no sanction whatsoever on the plaintiff, directed the Postmaster General to hold all "communist political propaganda" originating abroad pending assurances from the addressee that he did, indeed, wish to receive the material. Although the statute was directed only to the Postmaster General, not the addressee of the material, the standing of the addressee to challenge the statute was never in question; the effect of the statute was to burden his exercise of his First Amendment rights.

This Court concludes that plaintiff has proved all the facts predicate to standing: the injury he alleges, an abridgment of his freedom of speech, is being caused, if at all, by the present application of the Foreign Agents Registration Act to specific materials which plaintiff personally wishes to use immediately as part of his discourse with others about the issues raised by the films.[3]

Obviously, in reaching this conclusion, this Court parts company with its esteemed and learned brother in the district court for the District of Columbia. *See Block v. Smith,* 583 F.Supp. 1288 (D.C.D.C.1984). In *Block,* the court found that "plaintiffs have not alleged that their rights to ... exhibit ... the three films have been interfered with because of the Department of Justice action." *Id.* at 1293. In the present case, however, this is *precisely* the allegation made by the plaintiff. While it is true that the plaintiff herein alleges that the interference is accomplished by mere indirection, nonetheless, interference with speech is exactly what the plaintiff complains of.

In *Block,* the court also found that plaintiffs "could not allege" any interference with their freedom of speech "because the FARA does not prohibit foreign advocacy or place any limitations on the availability or showing of any material deemed to be 'political propaganda.'" *Id.* The plaintiff in the present action, however, contends that FARA *does* place limitations on the dissemination of materials deemed "political propaganda," albeit by the device of official government disparagement of the materials rather than direct proscription. If the observation of the United States Supreme Court in *Laird v. Tatum* that "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights" is to be given any meaning at all, the fact that the statute does not expressly prohibit or limit dissemination cannot be dispositive on the issue of standing. 408 U.S. at 12, 92 S.Ct. at 2325.

The plaintiff in the present action, like the plaintiffs in *Block,* alleges an injury to his reputation. The plaintiff herein alleges that this injury occurs simply by the application of FARA to the films he wishes to exhibit, whereas the plaintiffs in *Block* apparently alleged that the injury to their reputations occurred by reason of the reporting requirements of the Act. In *Block,* the court found that the allegations of injury to reputation were too speculative to support standing.

The common law doctrine of libel *per se* reflects the common understanding that some statements about a person are inevitably and obviously injurious to reputation; causation is so much a matter of common knowledge that special damages need not be proved. *See generally,* B.E. Witkin, *Summary of California Law,*

---

**3.** The defendants' argument that the plaintiff's status as a legislator is insufficient to confer standing is wholly irrelevant. This Court has never understood the plaintiff to be asserting that his status as a legislator, *per se,* gave him standing to challenge the Act; the First Amendment rights of legislators are neither more nor less extensive than the First Amendment rights of other citizens. The plaintiff's status as a legislator is relevant, if at all, only because it adds a certain piquancy to his claim that the government's conduct burdens his freedom of speech. Since the positions of legislators on matters of public policy are, by design, constantly subject to public scrutiny and periodically subject to constituent approval or disapproval, a legislator is more demonstrably vulnerable to the effects of a governmental policy to denigrate particular media of expression.

"Torts," §§ 280–283 (8th ed. 1974). The plaintiff herein has alleged and proved, via the uncontradicted declaration of Mervin Field, that a statement to the effect that an individual, and particularly a political incumbent, is an exhibitor of films which the United States Department of Justice has found to be political propaganda is such a statement. Such a statement "... has a tendency to injure him in his occupation" without regard to context. Cal.Civ.Code §§ 45 and 45a.[4]

The Court emphasizes that the plaintiff herein is not attempting to sue the defendants for defamation. The plaintiff has alleged an injury to his reputation by operation of the statute *only* to demonstrate the indirect way in which the statute abridges his freedom of speech. The statute puts the plaintiff to the Hobsen's choice of foregoing the use of the three Canadian films for the exposition of his own views or suffering an injury to his reputation. The Court, having found that the plaintiff has adequately demonstrated the probability and imminence of an injury to reputation occurring by operation of the statute, *cf.*, *City of Los Angeles v. Lyons, supra,* must conclude that the plaintiff has alleged, and now proved, an injury-in-fact sufficient to support standing.

## II

### FIRST AMENDMENT ABRIDGMENT

This action presents the novel question as to whether the First Amendment imposes any limitations on the power of Congress to choose a word or phrase as a term of art. It is important to note at the outset that the plaintiff is not challenging the power of Congress to require that materials produced by or under the aegis of a foreign government be labelled as to source. Rather, the question presented is

whether Congress may, consistent with the Constitution, apply a denigrating phrase to those materials thereby rendering the materials unavailable to American citizens who wish to use the materials as media for personal expression.

### A

As an aside, the Court notes that federal courts are courts of limited jurisdiction, and as such, must examine, *sua sponte,* the basis for jurisdiction over any particular dispute. Therefore, although the issue has not been raised by respective counsel, this Court feels impelled to decide whether the present action is justiciable. More specifically, the Court must decide whether the present action is barred by the political question doctrine.

 An action may be said to present a non-justiciable political question whenever there is:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). *See generally,* Wright, Miller & Cooper, *Federal Practice and Procedure.* Jurisdiction 2d §§ 3534, *et seq.* (2d ed. 1984). The present

---

4. Under most circumstances, a threatened injury to reputation is not actionable, but not because of the plaintiff's inability to prove causation, or lack of standing. Threatened injuries to reputation are not generally actionable because the First Amendment forbids prior restraints. *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75

L.Ed. 1357 (1931). The vindication of the value of protecting uninhibited public discourse and the consequent derogation of the value of protecting individual reputations is irrelevant to the standing of the individual to complain of the defamation.

action raises none of the aforementioned problems.

 The resolution of the issue presented by this action—the power of Congress to use any word or phrase it chooses as a term of art—has not been committed to a coordinate branch of government. While it is true that Congress is the supreme lawmaking body, U.S. Const. art. 1, § 1, it is the duty of the courts to invalidate those Congressional enactments violative of the Constitution. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). By the present action, the plaintiff seeks a determination of the constitutionality of a statute, an object squarely within the jurisdiction of the courts.

For the same reason, there is no lack of judicially discoverable and manageable standards for resolving the issue. The standard is provided by the First Amendment: "Congress shall make no law ... abridging the freedom of speech...." Opaque though that language may seem to be, courts have never declined to construe and apply the language whenever necessary.

The remaining four indicia of a political question have even less relevance. No "policy determination of a kind clearly for nonjudicial discretion" is entailed in assessing the constitutionality of a statute; the Constitution itself expresses the policy. Evaluating the constitutionality of a statute does not show a "lack of the respect due coordinate branches of government;" it is the pre-eminent duty of the courts. There is no need, unusual or otherwise, for "unquestioning adherence to a political decision already made." The choice of a particular phrase as a term of art is hardly a political decision, and in any event not one requiring unquestioning adherence. Finally, there appears no risk of multifarious pronouncements on the question by the various branches of government. Once the United States Supreme Court has adjudicated the application of the First Amendment to terms of art used in Congressional enactments, the question will be foreclosed.

The Court has chosen to explicate its reasoning on the issue of justiciability because it is acutely concerned that a judgment in favor of the plaintiff might hinder Congress in the performance of its legitimate duty. The business of legislative draftsmanship is, after all, the business of communication and one which can be exceedingly difficult. Indeed, the inherent difficulties of communication may be the most troublesome in the area of legislative draftsmanship, an area in which a special degree of precision and clarity is required. Congress is surely entitled to a generous measure of latitude in matters involving the legitimacy of its expression. Despite its concern, the Court concludes that there is no legitimate basis on which to decline to adjudicate the issue now presented by the parties' cross-motions for summary judgment.

B

On the issue of abridgment, the Court finds, as a matter of fact, that the phrase "political propaganda," and particularly the word "propaganda," is a "semantically slanted word." W. & M. Morris, *Harper Dictionary of Contemporary Usage* 501 (1975). In short, the term "propaganda" as used in ordinary speech, is a word of reproach. The Court's finding in this regard is based on the uncontradicted declarations of distinguished experts on American usage and by reference to authoritative works on American usage. For an example of the former, *see* Plaintiff's Exhibit B, Declaration of Leonard W. Doob, Senior Research Associate and Sterling Professor Emeritus of Psychology, Yale University; *see also* Plaintiff's Exhibit C, Declaration of Edwin Newman, correspondent for NBC News, author of two books, and dozens of newspaper and magazine articles on American English. *See also Seasongood v. C.I.R.,* 227 F.2d 907, 910–11 (6th Cir.1955). One example of the latter is provided by *Webster's New World Dictionary of the American Language* (2d. college ed. 1970), in which the senses of a word are listed in

historical progression. *Id.* at xii. The last listed definition given for "propaganda" is:

3. ideas, doctrines, or allegations so spread; now often used disparagingly to connote deception and distortion.

*Id.* at 1138. *See also Funk & Wagnalls Standard College Dictionary* 1080 (1973) ("Propaganda is now often used in a disparaging sense, as of a body of distortions and half-truths calculated to bias one's judgment or opinions.")

The Court further finds, as a matter of fact, that there are dictionary meanings of the word "propaganda" that do not suggest a negative connotation. For example, *The American Heritage Dictionary of the English Language* 1048 (1976) defines "propaganda," when used as a common noun, simply as "the systematic propagation of a given doctrine or of allegations reflecting its views and interests." Consistent with its previous finding, however, the Court finds that these dictionary meanings have little if anything to do with the use of the word "propaganda" in ordinary speech.

Finally, the Court finds that the definition of the phrase "political propaganda" contained in the Foreign Agents Registration Act partakes neither of the usual, negative, sense of the words nor of any of the other possible dictionary meanings. It is a unique construct of the legislative draftsmen. As such, it is relatively unambiguous. Furthermore, the statutory definition of "political propaganda," considered wholly apart from the conventions of ordinary usage, carries no negative connotation.

### C

The government argues that, because statutes are, whenever possible, to be construed as constitutional, and because the internal, statutory definition of "political propaganda" is neutral, this Court must conclude that the statute is constitutional. This argument, however, finesses the basic question: is a neutral statutory definition of an otherwise inflammatory phrase dispositive of a constitutional challenge to the use of such a phrase as a term of art?

The venerable canon of statutory construction that a statute is to be construed as constitutional if at all possible is simply not relevant to this case. That principle directs the Court to adopt an interpretation of a statute, even if somewhat strained, that is consistent with the Constitution in preference to an alternative interpretation that is inconsistent with the Constitution. This directive *presupposes* at least two plausible alternative readings of a statute and an independent assessment, by the Court, of the constitutionality of the various readings. It has no application when either interpretation is constitutional, neither interpretation is constitutional, or there are no plausible alternative readings of a statute.

In the instant case, there are no competing plausible interpretations of FARA. Indeed, as noted above, the Act is relatively unambiguous. The plaintiff is not claiming that the statutory definition is unclear, nor is he challenging the application of FARA *by its terms* to the three Canadian films at issue. The plaintiff claims simply that the use by Congress of an inflammatory phrase to designate (or denigrate) clearly protected First Amendment materials abridges his speech. To suggest that the obligation to construe a statute so as to render it constitutional has any application to this question is to indulge in bootstrapping.

Similarly, the cases cited by the government for the proposition that a court is bound by the definitions provided in the statute are inapposite. None of the cases involved a *constitutional* challenge to a statutory definition, much less a constitutional challenge to a term of art. In each of the cases, the court declined an invitation to rewrite a statutory definition to broaden it or narrow it for the benefit of one of the parties. In each of the cases, the court, when asked to ascertain the meaning of the words of a statute, refused to countenance a reading at variance with

the unambiguous intendment of the legislature.

These cases quite obviously have no application to the question raised by the instant litigation. The plaintiff herein is not asking the Court to construe the phrase "political propaganda" as used in FARA so as to render the statute inapplicable to the films he wishes to exhibit. Rather the plaintiff is contending that Congress is without the constitutional power to use the phrase "political propaganda" to describe the materials subject to the statute's labelling requirement, because those materials are "core" First Amendment materials and because the use of such a term abridges his freedom of speech.

In sum, the present case is not a case involving statutory construction but one involving constitutional power. Accordingly, the Court finds the doctrine of statutory construction largely irrelevant and of no assistance in the Court's resolution of the constitutional challenge.

### D

▮▮▮▮ There can be no doubt that the materials subject to the Foreign Agents Registration Act are materials protected by the First Amendment. Film is no less protected by the First Amendment than other media of expression. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260 (1948). The films regulated by the Act, *i.e.*, films addressing public policy issues, are among the materials the protection of which is the principal *raison d'etre* of the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression...."). Finally, regardless of the unavailability of the First Amendment's protections to foreign governments *qua* foreign governments, the plaintiff herein is a citizen of the United States and thus entitled to invoke the First Amendment in challenging the constitutionality of the Act. *See Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

### E

▮▮▮▮ On the issue of the meaning of the term "abridgment," the Court, using both historical materials available to it and the decisions of the United States Supreme Court, has nevertheless been unable to uncover any generalized discussion of the meaning of the term. However, the synonyms used by the Court in its First Amendment cases include "restrict," *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), "limit," *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980), *Brown v. Hartlage*, 456 U.S. 45, 62, 102 S.Ct. 1523, 1533, 71 L.Ed.2d 732 (1982) (concurrence), "impinge," *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), *Buckley v. Valeo, supra*, 424 U.S. at 22, 96 S.Ct. at 636, and "burden," *id.* at 44, 96 S.Ct. at 646. From these cases, the Court concludes that "abridgment" as used in the First Amendment means neither more nor less than what it ordinarily means: an "abridgment" occurs when a legislative act either suppresses or substantially interferes with speech. As such, the question of possible abridgment is one of an evidentiary nature.

It is possible to argue that the First Amendment, as a limitation on Congressional power, was intended solely to apply to the *objects* of enactments and not to the *form* of enactments. It is likewise possible that the First Amendment was not intended to apply where Congress enacts a statute whose purpose is entirely proper, but which inadvertently burdens speech by the terms in which it is couched. This Court, however, perceives no historical or semantic support for such an argument. It may well be that the First Amendment was

drafted in contemplation of direct and express suppressions of speech, but it is unlikely that the framers would have countenanced with equanimity indirect or surreptitious interferences with speech. *Cf. generally, Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1984). It is difficult to see why a restriction on speech effectuated by the terms in which Congress couches its enactments is less violative of the First Amendment than other indirect restrictions. Finally, the language of the First Amendment is sufficiently sweeping to justify a reading that forbids abridgments of speech, regardless of how they are accomplished.

In any event, this Court concludes that the suppression of speech was part of the intent of Congress in adopting the challenged portion of the Foreign Agents Registration Act.[5] While it is true that the Act was *primarily* intended as a "sunshine" statute, there can be little doubt that Congress was alarmed about the distribution within this country of materials it regarded as un-American, twisted, and pernicious. H.R.Rep. No. 1381, 75th Cong., 1st Sess. (1937); *Amending Act Requiring Registration of Foreign Agents: Hearings on H.R. 6045 Before Subcomm., No. 4 of the House Comm. on the Judiciary*, 77th Cong., 1st Sess. 17 (1941) (statements of L.H.C. Smith, Chief, Special Defense Unit, Department of Justice and Hon. Adolf A. Beale, Jr., Assistant Secretary of State). The "sunshine" aspects of the Act reflects Mr. Justice Brandeis' perspective:

> Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.

L. Brandeis, *Other People's Money* 62 (National Home Library Foundation ed. 1983), quoted in *Buckley v. Valeo*, 424 U.S. at 67, 96 S.Ct. at 657. In this context, "sunshine" is an antidote to that which is evil or injurious. Although a revelation of source as a means of impeaching the persuasive force of any piece of advocacy is wholly legitimate, and, indeed, consistent with the loftiest conceptions of the First Amendment, *see Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927), the legislative history considered as a whole makes it abundantly clear that Congress enacted the portion of FARA at issue in order to suppress or restrict that which it found abhorrent. Despite its employment of a wholly legitimate means to that end, Congress used the appellation, "political propaganda," which it understood and intended as a term of opprobrium, and by which it intended to discourage or suppress speech.

For all of these reasons, the Court holds that an abridgment within the meaning of the First Amendment occurs whenever there is a suppression of or substantial interference with speech, regardless of the *modus operandi.*

### F

With respect to the evidentiary question—does the phrase "political propaganda," when officially applied by officials of the United States Department of Justice, abridge speech—the Court has little difficulty. The declaration supplied by Mervin Field, neither rebutted nor impeached by the defendants, establishes beyond peradventure of a doubt that whoever disseminates materials officially found to be "political propaganda" runs the risk of being held in a negative light by members of the general public.[6] *See* Gallup Study of the

---

5. On the appropriateness of considering legislative motive, *cf. United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) *with Wallace v. Jaffree*, —— U.S. ——, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). *See generally*, L. Tribe *American Constitutional Law* § 12–6 (1978).

6. The United States Supreme Court had little trouble in concluding that the phrase "communist political propaganda" was disparaging, despite a neutral statutory definition. *Lamont v. Postmaster General, supra*, 381 U.S. at 303, 85 S.Ct. at 1494. ("Communist political propaganda" was defined as materials falling within the definition of 22 U.S.C. § 611(j) and originating from countries with respect to which tariff concessions had been suspended or withdrawn.)

Effect of Campaign Disclosures on Adults' Attitudes Toward Candidates, July, 1984; Plaintiff's Exhibit A, Declaration of Mervin D. Field, at 3. For this reason, the Court finds that Congress' use of the phrase "political propaganda" to describe the materials subject to the registration and reporting requirements constitutes a burden on speech by making such materials unavailable to all but the most courageous. Since the exercise of First Amendment rights often requires an act of courage, it is important to note that the courage required by the operation of FARA is not the courage of one's convictions but the courage to use materials officially censured by the government.

### G

▮▮▮▮▮▮ To conclude that a particular enactment abridges speech does not conclude the inquiry, for it is well-settled that Congress may, in appropriate circumstances, enact statutes which restrict or suppress speech. *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). When the enactment affects the discussion of controversial matters of burning public importance, however, the interference with speech must be justified by a compelling state interest. *Buckley v. Valeo*, 424 U.S. at 25, 96 S.Ct. at 637, *passim. See generally*, L. Tribe, *American Constitutional Law* § 12–8 (1978).

In arguing for the existence of an overriding governmental interest justifying an interference with speech, the defendants repeatedly advert to the purpose of the statute as a whole: *to inform recipients of advocacy materials produced by or under the aegis of a foreign government of the source of such materials*. The contention that this serves rather than disserves the First Amendment can hardly be gainsaid, but this misses the point. The abridgment of speech occasioned by the Act does not arise from the operation of the statute taken as a whole; it arises from the use of the phrase "political propaganda." Enactments affecting the freedom of speech must be as narrowly drawn as possible to effectuate legitimate governmental goals and to minimize the adverse impact on First Amendment rights. *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978); *Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1407 (9th Cir.1985). In the present case, the defendants have proffered no justification compelling or otherwise for the use of the phrase "political propaganda."

One justification for the Court's countenancing the use of such a phrase despite its adverse effect on freedom of speech is that as noted above—the inherent difficulty of drafting a statute. It may plausibly be argued that the drafting of a statute is so difficult that considerable latitude is to be given Congress and that any incidental effect on First Amendment rights is simply a cost to be borne. Ultimately, however, this Court finds this justification not compelling. First, as has already been discussed, Congress understood and intended the phrase "political propaganda" to be derogatory. Employing the phrase "political propaganda" to designate those materials was a wholly gratuitous step designed to express the suspicion with which Congress regarded the materials. Second, at the time Congress originally enacted the statute, the word "propaganda" had long acquired its unsavory connotation.

> Derived from this celebrated society, the name *propaganda* is applied in modern political language as a term of reproach to secret associations for the spread of opinions and principles which are viewed by most governments with horror and aversion.

Oxford English Dictionary 1466 (1971), *quoting* Brande, W., A Dictionary of Sci-

---

*Id.* The neutral statutory definition did not deter the Court from reaching the obvious conclusion that the phrase was pejorative. The Court found that materials to which the Act applied were materials that "the Federal Government says contains the seeds of treason."

ence, Literature and Art (1842). Third, the negative connotation of the phrase "political propaganda" could have been established by an *objective* standard: the understanding of the community as a whole rather than that of any idiosyncratic individual within the community. However difficult it may be to draft a statute, it is surely not beyond reason to demand that those whose business is communication communicate with their audience in terms of their audience's linguistic conventions. In the present case, Congress chose not so much to flount those conventions ·as to exploit them. The use of the phrase "political propaganda" reflects neither the best solution to a knotty problem of draftsmanship nor a then-current usage that time has now rendered archaic. It reflects a conscious attempt to place a whole category of materials beyond the pale of legitimate discourse. This is beyond the power of Congress:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). *See also, Wallace v. Jaffree*, —— U.S. ——, —— –——, 105 S.Ct. 2479, 2495–2503, 86 L.Ed.2d 29 (1985) (O'Connor, concurring).

### H

As noted above, plaintiff is not now challenging any part of the Foreign Agents Registration Act except that portion which incorporates the term "political propaganda" as a term of art. 22 U.S.C. § 611(j). Having previously found that the term "political propaganda" has the purpose and effect of constricting the plaintiffs' freedom of speech by making materials to which the term is applied unavailable to the plaintiff, the Court further finds the phrase "political propaganda" infects § 4 of the Act, 22 U.S.C. § 614, which prescribes the manner in which "political prop-

aganda" is to be treated. For this reason, the Court concludes that it cannot give plaintiff the relief to which he is entitled without declaring *both* §§ 611(j) and 614 unconstitutional.

On the other hand, the Court finds that §§ 611(j) and 614 are wholly severable from the balance of the Act. Accordingly, no portion of this Court's opinion and order are to be considered or regarded as having adjudicated the constitutionality of any other portion of the respective Act. *Regan v. Time, Inc.*, —— U.S. ——, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984); *United States v. Jackson*, 390 U.S. 570, 585–586, 88 S.Ct. 1209, 1218–19, 20 L.Ed.2d 138 (1968).

### CONCLUSION

Having found that the films which plaintiff wishes to exhibit are, *prima facie*, protected by the First Amendment, that the use of the phrase "political propaganda" in the Foreign Agents Registration Act abridges plaintiff's freedom of speech within the meaning of the First Amendment, and that there is no compelling governmental interest justifying the use of such a phrase,

IT IS HEREBY ORDERED that the plaintiff's motion for summary judgment be GRANTED, and that the defendants' motion for summary judgment be DENIED; and

IT IS FURTHER ORDERED that the defendants, their agents, servants, employees and attorneys, and all who act in concert with them be, and the same hereby are, permanently enjoined from enforcing any portion of the Foreign Agents Registration Act which incorporates the term "political propaganda" as a term of art. 22 U.S.C. §§ 611(j) and 614(a)(b) and (c).

IT IS SO ORDERED.

### ON MOTION TO ALTER JUDGMENT

Presently pending on this court's law and motion calendar for November 4, 1985 is defendants' motion to alter this court's judgment of September 12, 1985, under F.R.Civ.P. 59(e), or in the alternative, to

issue a stay, under F.R.Civ.P. 62(c), pending appeal to the United States Supreme Court. Plaintiff has timely opposed said motion. E.D.Cal.L.R. 230(c). After a review of the moving papers and the file in the above-entitled case, the court now concludes that it will not be materially assisted in its deliberations by oral argument of the respective counsel. Accordingly, this court will order defendants' motions submitted on the moving papers. E.D.Cal.L.R. 230(h).

PROCEDURAL BACKGROUND

On September 12, 1985, this court issued a permanent injunction enjoining the defendants, their agents, servants, employees, and attorneys, and all who act in concert with them from enforcing any portion of the Foreign Agents Registration Act which incorporates the term "political propaganda" as a term of art under 22 U.S.C. §§ 611(j) and 614(a), (b), and (c). On September 13, 1985, the clerk of the court entered judgment for plaintiff. On September 27, 1985, defendants filed the instant motion. On October 11, 1985, defendants appealed the judgment of this court to the United States Supreme Court pursuant to 28 U.S.C. § 1252.

DISCUSSION

■■ At the outset, plaintiff challenges defendants' motion to alter or amend the judgment as not having been timely filed. Pursuant to F.R.Civ.P. 59(e), "[a] motion to alter or amend the judgment shall be served not later than *10* days after entry of judgment." (emphasis added). To compute time, the court refers to F.R.Civ.P. 6(a):

> (a) Computation. [Effective on August 1, 1985. See, also, subdivision (a) above.] In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in

court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days. When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation. . . .

Here, defendants' motion was filed on September 27, 1985. The date of the entry of judgment, September 13, 1985, as well as Saturdays, September 14 and 21, 1985, and Sundays, September 15 and 22, 1985 are excluded under F.R.Civ.P. 6(a). Hence, defendants' motion to alter or amend was timely filed on the tenth day.

I

■■ The decision to alter or amend a judgment is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion. F.R.Civ.P. 59(e). *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983); *Thomas v. Farmville Mfg. Co.,* 705 F.2d 1307 (11th Cir.1983). *See, e.g., Ellis v. Brotherhood of Railway, Airline & Steamship Clerks,* 685 F.2d 1065, 1071 (9th Cir.1982).

Defendants propose that this court alter the judgment so that it enjoins defendants from enforcing the Foreign Agents Registration Act, 22 U.S.C. §§ 611(j) and 614(a), (b), and (c), as against the three films in question, namely, *If You Love This Planet, Rain: Requiem or Recovery,* and *Acid From Heaven.* Defendants seek such a change because the current order, according to defendants, does not clearly notify them as to what acts are prohibited. Defendants contend the term "political propaganda" runs throughout the statute and could be construed to prohibit any enforcement of the Act. Furthermore, defendants assert the present order does not fit the constitutional violation established and goes beyond the facts of the case.

■■ This court's memorandum and order of September 12, 1985 rather expan-

sively enjoins defendants "from enforcing any portion of the Foreign Agents Registration Act which incorporates the term 'political propaganda' as a term of art. 22 U.S.C. §§ 611(j) and 614(a), (b), and (c)." F.R.Civ.P. 65(d) states in pertinent part:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained....

"The basic principle of the federal rule is that those against whom an injunction is issued should receive fair and well-defined notice of what the injunction prohibits." *Transgo Inc. v. AJAC Transmission Parts Corp.,* 768 F.2d 1001, 1022 (9th Cir.1985). Although a federal court has broad equitable powers to remedy constitutional violations, it must tailor the scope of injunctive relief to fit the nature and extent of constitutional violation established. *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1041 (5th Cir.1982); *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982). *See, e.g., Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979); *Dayton Bd. of Education v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977).

█ Having reviewed the memorandum and order of September 12, 1985, this court now determines that its final order was too broadly phrased. The Foreign Agents Registration Act utilizes the language "political propaganda" throughout and not only in the constitutionally infected provisions of 22 U.S.C. §§ 611(j) and 614(a), (b), and (c). Since this court made no ruling on the constitutionality of any other portion of the respect Act, the parameters of this court's order is less than clear. Moreover, this court wishes to remain consistent and limit its permanent injunction to the imposition of the Foreign Agents Registration Act on the three films, as it did in granting plaintiff's motion for a preliminary injunction. *Keene v. Smith,* 569 F.Supp. 1513, 1523 (E.D.Cal.1983). By such specific limitation this court is persuaded not only will

defendants be appraised of the boundaries of the injunction, but the injunction will be tailored more precisely to the nature and extent of the constitutional violation.

For the reasons as set forth herein, this court will order that its memorandum and order, dated September 12, 1985 be modified to delete page 35, lines 4 through 9 and insert the following language in its stead:

IT IS FURTHER ORDERED that the defendants, their agents, servants, employees and attorneys, and all who act in concert with them be, and the same hereby are, permanently enjoined from enforcing the Foreign Agents Registration Act, 22 U.S.C. §§ 611(j) and 614(a), (b), and (c), respectively, as against the films *If You Love This Planet, Rain: Requiem or Recovery,* and *Acid From Heaven.*

II

█ Defendants next request that the court issue a stay, pursuant to F.R.Civ.P. 62(c), pending appeal to the United States Supreme Court. The considerations governing whether a stay should be granted are threefold: (1) Have the movants established a strong likelihood of success on the merits? (2) Does the balance of irreparable harm favor the movants? (3) Is the public interest served by the grant of the injunction? *Dellums v. Smith,* 577 F.Supp. 1456, 1457 (N.D.Cal.1984), *citing Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 551 (9th Cir.1977). *See also Lopez v. Heckler,* 713 F.2d 1432, 1436 (9th Cir.1983). "Stays are sparingly granted. They are a disfavored remedy because they interrupt the ordinary process of judicial review and postpone relief for the prevailing party." *Dellums,* 577 F.Supp. at 1457.

Defendants argue they will be irreparably harmed if the stay is not granted because they are in doubt as to what portions of the Act they are allowed to enforce and may possibly be subject to a contempt citation. Defendants contend plaintiff's only harm will be that of some delay. Further-

more, defendants assert they have a substantial probability of prevailing on the merits as this court did not adopt the defendants' standing argument as presented in *Block v. Smith*, 583 F.Supp. 1288 (D.D.C.1984) and because the Supreme Court will not find that the term "political propaganda" carries a negative connotation. Lastly, defendants propound that the issuance of a stay will be in the public interest as this court's decision cripples enforcement of the Act which, according to the defendants, serves to inform the public of the source of material disseminated by foreign governments and requires foreign agents to register with the Department of Justice.

The court views defendants' arguments to be meritless and to have been mooted by the disposition of defendants' motion to alter or amend the judgment. First, the court finds that defendants have put forth no new arguments which would persuade this court to find they have a strong likelihood of prevailing on the merits. Rather, defendants' arguments are a repeat of what was presented and rejected by the court on the parties' cross-motions for summary judgment. Second, the court believes the narrowing of its permanent injunction order eliminates any possibility of irreparable harm befalling the defendants. Third, the court's order in no way impedes the enforcement of the Act and hence a stay pending appeal will not *per se* serve the public interest. Therefore, this court finds that defendants have failed to meet the burden of justifying the issuance of a stay pending appeal in the instant litigation.

For the foregoing reasons, and good cause appearing therefor,

IT IS HEREBY ORDERED that oral argument scheduled on November 4, 1985 for defendants' motion to alter this court's judgment of September 12, 1985, or in the alternative, to issue a stay pending appeal is VACATED and deemed submitted on the moving papers;

IT IS FURTHER ORDERED that defendants' motion to alter is GRANTED to the extent as incorporated herein;

IT IS FURTHER ORDERED that defendants' motion to issue a stay pending appeal is DENIED.

IT IS SO ORDERED.